IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JARMEL P.,[1]
     Plaintiff,

          v.                                   Civil No. 3:22-cv-00608 (HEH)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act (the "Act"). Plaintiff was thirty-three years old at the time of his application and previously worked as a mail handler and delivery driver. (R. at 70-72, 113, 115, 254, 265.) Plaintiff alleges he is unable to work due to medical complications from a heart attack, high blood pressure, obesity, depression, anxiety, attention deficit hyperactivity disorder, and diabetes. (R. at 66-68, 264.)

On March 11, 2022, an Administrative Law Judge ("ALJ") issued a decision finding Plaintiff not disabled. (R. at 19.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year

For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 18) and Motion for Remand (ECF No. 19) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On November 12, 2019, Plaintiff filed concurrent applications for disability insurance benefits and supplemental security income, which the SSA denied initially on September 30, 2020, and upon reconsideration on April 22, 2021. (R. at 113, 115, 117-18, 146, 221, 228.) At Plaintiff's request, the ALJ held an administrative hearing on September 16, 2021, attended by Plaintiff and his counsel. (R. at 58-98, 154.) At the hearing, Plaintiff amended his alleged disability onset date to October 14, 2020. (R. at 66.) At Plaintiff's counsel's request, the ALJ held a supplemental hearing on February 8, 2022. (R. at 42-57.) On March 11, 2022, the ALJ issued a written opinion, finding Plaintiff not disabled under the Act. (R. at 22-36.) Plaintiff requested review of the ALJ's decision, and on August 10, 2022, the SSA Appeals Council denied it, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 9-11.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).[3]

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual

---

of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for supplemental security income.

findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, the "substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. *Id.* §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform his past work given his residual functional capacity. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform his past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 25-36.) *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)

(describing the ALJ's five-step sequential evaluation). At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the relevant period. (R. at 25.) At step two, the ALJ found that Plaintiff's chronic ischemic heart disease, obesity, and asthma constituted severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. at 25.) Notably, the ALJ determined that Plaintiff's diabetes, hyperlipidemia, hypertension, obstructive sleep apnea, depression, anxiety, and attention deficit hyperactivity disorder were non-severe impairments "as they cause no more than a minimal limitation in [Plaintiff]'s ability to perform basic, work-related activities." (R. at 25.) At step three, the ALJ decided that Plaintiff did not have an impairment, individually or in combination, which met or medically equaled one of the listed impairments in the regulations. (R. at 27.)

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity,[4] finding that Plaintiff could perform light work with the following limitations:

> [L]ift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and walk a combined six out of eight hours; sit a combined six out of eight hours; ability to push and/or pull is only limited by the amount he can lift and/or carry; occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; balance without limitations; occasionally kneel, crouch, and crawl; frequently stoop; can perform work requiring no exposure to extreme heat in the performance of job duties.

(R. at 28.)

---

[4] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

Based on these findings, the ALJ found at step four that Plaintiff could not perform his past relevant work, at least in the manner in which such work is generally performed.[5] (R. at 34.) At step five, the ALJ determined that there were other jobs in significant numbers in the national economy that Plaintiff could perform. (R. at 35.) As part of this process, the ALJ considered the interrogatory answers of a vocational expert, who attested that given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform the requirements of occupations such as cleaner/housekeeper, marker, and storage facility rental clerk. (R. 35, 330.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 36.)

## IV. ANALYSIS

Plaintiff alleges that multiple errors necessitate remand. (Pl.'s Mem. Supp. Summ. J. at 1-2, 7, 10-15, ECF No. 20) ("Pl.'s Mem.").) First, Plaintiff claims that the ALJ erred when she determined that Plaintiff's diabetes and depression were non-severe impairments. (Pl.'s Mem. at 10.) Second, Plaintiff contends that the ALJ erroneously evaluated the medical opinion evidence by relying on "objective medical evidence to discredit [Plaintiff]'s subjective complaints . . . ." (Pl.'s Mem. at 11-13.) Third, Plaintiff argues that the ALJ's residual functional capacity assessment failed to fully account for "the combined effects of [Plaintiff]'s medical impairments[,]" which "cause intermittent incapacity." (Pl.'s Mem. at 14.) Plaintiff maintains that the ALJ erred by "finding [Plaintiff] capable of work at the light exertional level" because the record demonstrates he "cannot stand and walk for six out of eight hours." (Pl.'s Mem. at 15.)

Defendant responds that the ALJ's decision should be affirmed because: (1) substantial evidence supports the ALJ's finding that Plaintiff's diabetes and depression were non-severe; (2)

---

[5] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 404.1565(a).

the ALJ reasonably and sufficiently considered the medical opinions according to the relevant regulations; and (3) the ALJ accounted for all of Plaintiff's medically determinable impairments, including the combination of his symptoms, in the residual functional capacity assessment, and substantial evidence supports the ALJ's findings. (Def.'s Mot. Summ. J. Br. Supp. 14-23, ECF No. 21) ("Def.'s Mem.").) For the reasons that follow, the Court finds that the ALJ did not err in her residual functional capacity analysis, and substantial evidence supports her findings.

## A.   The ALJ Did Not Err When She Determined Plaintiff's Diabetes and Depression Were Non-Severe Impairments.

Plaintiff first argues that "the ALJ committed a reversible error when she found that [Plaintiff]'s diabetes and depression were not severe medical impairments. Then she compounded her step two error by failing to adequately consider these medical impairments and their effects later in the sequential analysis." (Pl.'s Mem. at 10) (internal citations omitted.) Defendant responds that "[t]he ALJ fully considered the record evidence, which supports the finding that Plaintiff's diabetes and depression were non-severe impairments." (Def.'s Mem. at 14.) Defendant further avers that the ALJ's decision to find these impairments non-severe is "not dispositive" because the ALJ considered the effects pertaining to Plaintiff's diabetes and depression at subsequent steps in the sequential evaluation process. (Def.'s Mem. at 18-19.)

At step two, the ALJ considers the "medical severity" of a claimant's "medically determinable" impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). To constitute a "medically determinable" impairment, a claimant's alleged impairment "must be established by objective medical evidence from an acceptable medical source." *Id.* §§ 404.1521, 416.921. If an impairment is medically determinable, the ALJ then determines whether such impairment is "severe." *Id.* To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c), 404.1522(a),

7

416.922(a). Additionally, "[u]nless [the claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months" to be "severe." *Id.* §§ 404.1509, 416.909, 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

In the instant case, at step two, the ALJ concluded that Plaintiff's diabetes, depression, anxiety, and attention deficit hyperactivity disorder, considered singly and in combination, "do not cause more than minimal limitation in [Plaintiff]'s ability to perform basic mental work activities, and are, therefore, non-severe." (R. at 25.) Plaintiff now claims that it was error for the ALJ to find that his diabetes and depression were non-severe.

First, regarding diabetes, the ALJ noted Plaintiff's medical history before the relevant period, including his 2018 diagnosis and emergency room visit due to high blood sugar levels. (R. at 25.) However, the ALJ explained that Plaintiff's diabetes was "under excellent control" in 2019, "as he had an A1C of 5.6 percent." (R. at 25.) The ALJ also noted that Plaintiff did not require further hospitalization, and continued to treat his diabetes with medication. (R. at 25.) Consequently, when evaluating Plaintiff's diabetes, the ALJ found that "no aggressive treatment was recommended, or is anticipated, for [them]" and that Plaintiff "did not testify to, nor does the record show, significant signs of clinical dysfunction from [them]." (R. at 25.) Accordingly, the ALJ found Plaintiff's diabetes to be non-severe.

A review of the record reflects that Plaintiff managed his diabetes with insulin and rarely sought emergency care for high blood sugar levels. (R. at 478, 762.) Plaintiff's diabetes remained controlled and managed by his primary care provider, and, despite some blood glucose level fluctuations, presented as uncomplicated. (R. at 878, 886, 908, 912.) Although Plaintiff testified that his diabetes was "getting worse" since his diagnosis, the record shows "excellent control of diabetes" and no complications. (R. at 346.) Consequently, the undersigned finds that substantial

evidence supports the ALJ's determination that Plaintiff's diabetes was a non-severe impairment, as the record generally does not demonstrate that Plaintiff's diabetes significantly limits his physical ability to do work-related activities.

Second, with regards to Plaintiff's depression, the ALJ considered the broad functional areas of mental functioning set forth in the disability regulations for evaluating mental disorders and in the Listing of Impairments. (R. at 25-26, citing 20 C.F.R., Part 404, Subpart P, App'x 1.) Known as the "paragraph B" criteria, these four functional areas are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. *See id*.

The ALJ first found that Plaintiff had no limitation in understanding, remembering, or applying information. (R. at 26.) She reasoned that, although Plaintiff claimed he needed to be reminded to take his medicine, he also indicated that he could follow instructions to prepare meals, drive a car, handle finances, and follow written and verbal instructions "very well." (R. at 26, citing R. at 287-88, 290.) The ALJ also noted Plaintiff generally exhibited normal mental status during examinations, "revealing a normal mood and affect, normal speech, normal attention and concentration, intact memory, and normal thought content." (R. at 31.) She next found that Plaintiff had no limitation in his ability to interact with others. (R. at 26.) She considered Plaintiff's testimony that he struggled with social anxiety and was "often reluctant to leave his house to socialize with friends and family." (R. at 26.) However, the ALJ found that "[Plaintiff] denied any difficulty getting along with family, friends, neighbors, or others, and he stated that he [got] along well with authority figures." (R. at 26.) Additionally, the ALJ determined that Plaintiff's providers found him to be cooperative during appointments. (R. at 26.)

The ALJ then found that Plaintiff had no limitation in the third functional area: concentrating, persisting, or maintaining pace. (R. at 26.) In making this determination, the ALJ

acknowledged Plaintiff's testimony that he "struggle[d] with poor focus daily. However, in a function report, [Plaintiff] stated that he always finishes tasks after starting." (R. at 26.) The ALJ also noted that Plaintiff "exhibited a normal attention span and concentration on examination[,]" and "normal psychomotor activity." (R. at 26.)  Moreover, Plaintiff's daily activities demonstrated "an ability to maintain a basic level of focus for daily tasks." (R. at 26.) Finally, the ALJ found that Plaintiff had no limitation in his ability to adapt or manage himself. (R. at 26.) Although Plaintiff alleged "difficulty handling stress and changes in routine[,]" he also stated that "he independently manages daily activities, as he helps care for his three children, prepares meals, completes chores, drive[s] a car, shops in stores, and manages finances." (R. at 26) (citations omitted). The ALJ highlighted how Plaintiff exhibited "good judgment and insight on examination" and "appeared well groomed and had normal hygiene." (R. at 26.) Thus, the ALJ concluded that, overall, Plaintiff's depression was non-severe because it caused no more than "mild" limitation in any of the functional areas and the evidence failed to indicate more than a minimal limitation on his ability to do basic work activities. (R. at 26.)

The undersigned finds that substantial evidence supports the ALJ's findings. As noted by the ALJ, Plaintiff's medical records evince mostly normal mental status examinations showing that Plaintiff had normal memory, cognition, attention, judgment and insight, psychomotor activity, hygiene, and emotional regulation. (R. at 480, 484, 757-58, 881-82, 990, 1037, 1047, 1049.) Moreover, the ALJ did not rely on objective evidence alone when she discredited Plaintiff's subjective complaints regarding the limitations caused by his depression. The ALJ also weighed Plaintiff's statements about the extent to which he could perform daily activities, which she analyzed when determining the severity of Plaintiff's depression. (R. at 26.) For instance, the ALJ acknowledged Plaintiff's testimony that he struggled with social anxiety but pointed out that

Plaintiff also denied any difficulty getting along with family, friends, and authority figures. (R. at 26.) Further, Plaintiff endorsed spending time with others in person, on the phone, and via video chat. (R. at 289.) When asked how often he does these things, Plaintiff replied "everyday if I am able." (R. at 289.) Additionally, Plaintiff asserted in his function report that he needed special reminders to take his medication and that he forgets appointments, but also that he does not need to be reminded to go places. (R. at 287, 289.) In the same report, Plaintiff denied that his "illnesses, injuries, or conditions" affected his memory. (R. at 290.)

This is not to say, however, that the record entirely lacks evidence pertaining to how Plaintiff's depression impacted him. Indeed, as Plaintiff notes, the record contains evidence describing Plaintiff's struggles with depression, such as when he reported socially isolating himself and becoming easily irritated, which adversely impacted his relationships. (R. at 1048.) Plaintiff also reported difficulty focusing and remembering things, having low energy and a lack of interest in leaving home, and sleeping excessively during the daytime. (R. at 1045, 1048.) Nonetheless, a psychiatrist noted that, by November 2021, Plaintiff's anxiety was improving, as he adopted a dog, went on walks, and took his son to football practice. (R. at 1048.) Accordingly, the ALJ's decision is "not subject to reversal merely because substantial evidence would have supported an opposite decision." *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (citing *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). In this case, the ALJ carefully reviewed the medical treatment notes, weighed Plaintiff's subjective statements including his testimony and answers on the function report, and determined, based on substantial evidence, that Plaintiff's depression was not a severe mental impairment. Therefore, the undersigned finds no reversible error in the ALJ's decision.

**B.     The ALJ Did Not Err When She Evaluated the Medical Opinion Evidence.**

Plaintiff next contends that the ALJ erred in assessing the medical opinion evidence because the ALJ discredited certain medical opinions on the basis that they were unsupported by objective evidence. (Pl.'s Mem. at 12.) Specifically, Plaintiff points to the ALJ's evaluation of his treating psychiatrist, Isaac Wood, M.D. ("Dr. Wood"), and Plaintiff's primary care provider, Sherry Allgood, FNP ("Nurse Allgood").[6] (Pl.'s Mem. at 11-12.) Plaintiff explains that the ALJ "rejected" and "dismissed" these medical opinions on the basis that the providers failed to cite to objective evidence supporting their conclusions, which, according to Plaintiff, runs afoul of Fourth Circuit case law. (Pl.'s Mem. at 11-12.) Specifically, Plaintiff contends that *Shelley C. v. Commissioner of Social Security Administration*, 61 F.4th 341 (4th Cir. 2023), prohibits the ALJ from discrediting these medical opinions on the basis that they were unsupported by objective evidence, because such evidence is not often present in a disease such as chronic depression. (Pl.'s Mem. at 13; citing *Shelley C.*, 61 F.4th at 361 (restating its prior holding in *Arakas v. Commissioner*, 983 F.3d 83, 97 (4th Cir. 2020), that "ALJs could not rely upon the absence of objective medical evidence to discredit 'a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence'" and holding "that

---

[6] Plaintiff initially posits that the question presented in this matter is whether the ALJ's decision is supported by substantial evidence or in compliance with the correct legal standards when she "rejected" the medical evidence from Dr. Wood, Nurse Allgood, and Timothy Hagemann, M.D. ("Dr. Hagemann") "regarding [Plaintiff's] diabetes and depression and the fatigue, inability to maintain concentration, pace, and persistence, swelling, and other symptoms they cause[.]" (Pl.'s Mem. at 1-2.) While Plaintiff briefly references Dr. Hagemann's Cardiac Medical Source Statement, he subsequently fails to provide any argument in support of his contention that the ALJ erred when evaluating Dr. Hagemann's medical opinion. (Pl. Mem. at 4.) In the absence of any such argument, the undersigned deems it waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") As a result, the Court will address only the ALJ's evaluation of the medical opinions of Dr. Wood and Nurse Allgood.

depression—particularly chronic depression—is one of those other diseases.").) Therefore, Plaintiff argues, the ALJ impermissibly discredited the medical opinions of Dr. Wood and Nurse Allgood regarding Plaintiff's depression by requiring them to have objective support. (Pl.'s Mem. at 12-13.)

In response, Defendant argues that the ALJ did not discredit Plaintiff's subjective complaints based "*entirely* upon the belief that they were not corroborated by the record's medical evidence." (Def.'s Mem. at 16) (quoting *Shelley C.*, 61 F.4th at 360 (emphasis in original).) Instead, according to Defendant, the ALJ looked to Plaintiff's self-reported statements "about his daily activities and functional abilities and relied, in large part, on those reports." (Def.'s Mem. at 16.) The undersigned agrees with Defendant and finds that the ALJ did not err when evaluating the medical opinion evidence.

      *1. Legal Standard.*

For claims filed on or after March 27, 2017, revised regulations apply that change the framework for how an ALJ must evaluate medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 404.1520c. The revised regulations provide that the ALJ will no longer "give any specific evidentiary weight . . . to any medical opinion(s) . . . ." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. § 404.1520c(a). Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. § 404.1520c(a)-(b).

Under the relevant regulations governing the assessment of medical opinion evidence,[7] the ALJ must evaluate each medical opinion and articulate its "persuasiveness" by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered in the written opinion. *Id.* §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). Supportability and consistency are explained in the regulations as follows:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). However, when two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. *Id.* §§ 404.1520c(b)(3); 416.920c(b)(3).

---

[7] Plaintiff filed his disability claim after March 27, 2017. As a result, the revised rules regarding the assessment of medical opinion evidence in 20 C.F.R. §§ 404.1520c and 416.920c apply here.

2.   *Plaintiff's Treatment with Dr. Wood.*

Plaintiff began treating with Dr. Wood on July 29, 2021. (R. at 1045.) In an initial evaluation note, Dr. Wood wrote that Plaintiff:

> Sleeps all day. Does not sleep at night. Does not have an appetite (eats one meal a day) and has lost weight. Always feels fatigued. Cannot exercise because he is [short of breath]. Does not believe he has fully recovered from his [myocardial infarction]. Endorses anhedonia. In the last six months [his] sister and mother died. Feels helpless and hopeless. Has not experienced [suicidal ideation]. Passively wishes he was not here. Is afraid he will go to sleep and not wake up. Feels more comfortable sleeping during the day when someone will check on him.

(R. at 1045.) Dr. Wood also noted Plaintiff's medical history, particularly Plaintiff's heart attack in 2019, for which he was hospitalized for several days and claimed to continue experiencing shortness of breath that prevented him from "tend[ing] to normal activities." (R. at 1045.) During this appointment, Plaintiff reported that his medications have not "made a difference" and provided "no relief of depressive symptoms." (R. at 1045.) Additionally, Plaintiff reported that historically he "could not pay attention or concentrate; was easily distracted; had difficulty completing his work; was hyperactive; [and that] problems persist." (R. at 1045.) Moreover, Plaintiff claimed "he could not keep a job because he did not have the energy, felt exhausted and could not get out of bed." (R. at 1045.) During this initial evaluation, Plaintiff "appeared angry" and in a depressed mood but was found to be cooperative and with appropriate affect, normal thought process, thought content, and judgment. (R. at 1046.)  Dr. Wood prescribed Wellbutrin and recommended that Plaintiff follow up with him. (R. at 1047.)

In psychiatric notes from August 26, 2021, Plaintiff continued to have difficulty with attention, concentration, and maintaining focus, and reportedly did not notice a difference in his depressive symptoms despite medication. (R. at 1048.) Dr. Wood wrote that Plaintiff "[u]sed to be

able to engage in activities like cutting the grass, [but] tires easily" and struggles to stand up "long enough at the sink to shave, etc." (R. at 1048.) His mood was unchanged, and he did "not feel like he want[ed] to do anything. Has days when he sleeps excessively, is easily irritated and this impacts his family relationships." (R. at 1048.) Moreover, he continued to have "a difficult time going to sleep –does not go to sleep until 3-4 a.m. because he is afraid he will have a cardiac event and no one will be there to help him." (R. at 1048.) Dr. Wood increased Plaintiff's dosage of Wellbutrin and started him on Trazodone. (R. at 1050.)

Psychiatric notes from September 2021 showed that Plaintiff reported "a difficult time focusing in the last two weeks." (R. at 1048.) While his medication initially helped for about a week, Plaintiff was "again having a difficult time getting to sleep and staying asleep[,]" and continued to nap during the daytime. (R. at 1048.) He also described instances in which he was forgetful, or could not remember how, what, or why he was doing certain things. (R. at 1048.) He reportedly wanted to continue isolating himself socially, although "this has improved." (R. at 1048.) Plaintiff also reported going on walks and taking his son to football practice, but "noticed no difference with the higher dose of Wellbutrin." (R. at 1048.) Dr. Wood again increased Plaintiff's dosage of Wellbutrin. (R. at 1050.)

In November 2021, Plaintiff reported sleeping longer and being less tired during the day. (R. at 1048.) He continued having shortness of breath while walking, and purportedly could "walk a block and then ha[d] to stop." (R. at 1048.) Although he reported struggling with his mother's death and father's recent cancer diagnosis, he also told Dr. Wood that he recently got a dog, which lifted his mood and encouraged him be active. (R. at 1048.) "Some days [he] still feels down and does not want to be [a] bother and becomes asocial. Last at most for a full day." (R. at 1048.) Dr.

Wood noted that Plaintiff's anxiety was "much [i]mproved." (R. at 1048.) Dr. Wood advised Plaintiff to continue his medication regimen and to follow up in three months. (R. at 1050.)

### 3.  Dr. Wood's August 2021 Medical Opinion.

On August 30, 2021, Dr. Wood completed a "Mental Capacity Assessment" based on a medical assessment he conducted on July 29, 2021. (R. at 950-52.) He noted that Plaintiff was diagnosed with moderate major depressive disorder, attention deficit hyperactivity disorder, hypertension, morbid obesity, type 2 diabetes, and elevated cholesterol. (R. at 952.) He then rated Plaintiff's "ability to do work-related activities on a day-to-day basis in a regular work setting" in each area of mental functioning based on specified degrees of limitation, ranging from "none" to "extreme." (R. at 950-52.)

In the area of sustained concentration and persistence, Dr. Wood opined that Plaintiff would likely be absent from work four or more times in an average month due to his mental impairments. (R. at 950.) Plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from his psychologically based symptoms, and he would be markedly limited in his ability to perform at a consistent pace with a one-hour lunch break and two fifteen-minute rest periods. (R. at 950.) Plaintiff was moderately limited in his ability to carry out very short and simple instructions as well as detailed instructions. (R. at 950.) He was also moderately limited in his ability to maintain attention and concentration for extended periods. (R. at 950.) In addition, Plaintiff was slightly limited in his ability to perform activities within a schedule, maintain regular attendance, be punctual, and make simple work-related decisions. However, Dr. Wood found Plaintiff was not limited in his ability to sustain an ordinary routine without special supervision or to work with or in proximity to others without distraction. (R. at 950.)

When it came to social interaction, Dr. Wood determined that Plaintiff had a moderate limitation in his ability to get along with coworkers or peers without distracting them. (R. at 951.) In the area of adaptation, Dr. Wood noted that Plaintiff was moderately limited in his ability to respond appropriately to changes, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (R. at 951.) Finally, Dr. Wood noted that Plaintiff was not a malingerer and that the limitations he assessed had been present since 2019. (R. at 951-52.)

### 4.  The ALJ's Analysis of Dr. Wood's Medical Opinion.

In her decision, the ALJ summarized Dr. Wood's August 2021 medical opinion and found it "not persuasive" because "Dr. Wood only supported his opinion by referencing [Plaintiff's] mental diagnoses, but he did not cite to any objective evidence." (R. at 31.) She added that "[t]he record is inconsistent with any significant limitations in the areas of mental functioning," explaining, for example, Plaintiff's "normal mental status examinations, revealing a normal mood and affect, normal speech, normal attention and concentration, intact memory, and normal thought content." (R. at 31) (citations omitted). The ALJ also stated that Dr. Wood's opinion was inconsistent with Plaintiff's stated daily activities, "such as managing his own personal care, using a smartphone to check e-mails and use the internet, preparing meals, completing chores, driving a car, managing finances, and assisting his three children with virtual schooling." (R. at 32) (citations omitted).

Here, the ALJ did not err in her assessment of Dr. Wood's opinion on the grounds that it was not supported by "any objective evidence." (R. at 31.) First, the ALJ specified the objective evidence she was referring to – namely, Plaintiff's normal mental status examinations during medical appointments. (R. at 31.)  In doing so, the Court is able to conduct meaningful review of

18

the ALJ's reasoning. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). Second, the ALJ considered more than just the objective evidence, including Plaintiff's subjective statements, when she determined the persuasiveness of the opinion. For instance, the ALJ specifically noted that she "considered [Plaintiff's] independence with daily activities, such as managing his own personal care, using a smartphone to check e-mails and use the internet, preparing meals, completing chores, driving a car, managing finances, and assisting his three children with virtual schooling." (R. at 31-32.) Thus, the ALJ did not simply discredit Dr. Wood's medical opinion on the basis that it was not supported by objective evidence; rather, the ALJ evaluated the entire medical record, including Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms, to evaluate Dr. Wood's opinion.

The issue before this Court is whether the ALJ's finding that Plaintiff is not disabled is properly explained and supported by substantial evidence and that such decision was reached based upon a correct application of the relevant law. As stated above, the regulations require that the ALJ explain how she considered the consistency and supportability of the medical opinion and why—based on the evidence—the ALJ reached the particular conclusion she did as to the persuasiveness of the opinion. *See* 20 C.F.R. § 404.1520c(a)–(b). The ALJ satisfied that standard here, and substantial evidence supports her findings.

### 5. *Plaintiff's Treatment with Nurse Allgood.*

Nurse Allgood treated Plaintiff before and during the relevant period. On June 11, 2019, Plaintiff presented to Nurse Allgood for diabetes management. (R. at 428.) At this appointment, Plaintiff denied chest pains, palpitations, dyspnea, polydipsia, polyphagia, and fatigue. (R. at 428.) Plaintiff advised Nurse Allgood that he did not go to cardiac rehab because he had "been feeling fine and did not feel like he needed to go." (R. at 428.) He also reported having less shortness of

breath, was working a part-time job, and was "able to cut grass without stopping to rest." (R. at 428.) Plaintiff next followed up with Nurse Allgood in October 2020 shortly after a trip to the emergency room due to high blood glucose levels. (R. at 908.) Plaintiff reported weakness, feeling lightheaded, and having no energy or stamina. (R. at 908.) He also said that he could no longer cut grass without stopping but needed to take breaks multiple times. (R. at 908.) He also had "[o]ccasional midsternal chest pain" as well as "occasional dyspnea on and off for a while, exercise intolerance for [a] couple months . . . ." (R. at 908.) Plaintiff's physical and mental examination revealed normal findings. (R. at 910-11.) Plaintiff followed up later that month and reported his blood sugar levels were high, and that his wife was concerned he was depressed. (R. at 889-90.) He reported having "trouble keeping a full-time job with time missed and due to fatigue, shortness of breath, decreased endurance." (R. at 890.) Nurse Allgood's notes indicate that Plaintiff talked on the phone "more than three times a week" and got together with others "three times a week." (R. at 891.) However, Plaintiff was positive for depression and was "nervous/anxious." (R. at 892.) Plaintiff's physical examination findings remained unremarkable. (R. at 892.)

On December 3, 2020, Plaintiff called Nurse Allgood to report that he was feeling "depressed/anxious" and was "wondering if [Nurse Allgood] would consider [prescribing an] antidepressant," which she did ahead of their scheduled appointment on December 14, 2020. (R. at 887-88.) During the appointment on December 14, 2020, Nurse Allgood completed Plaintiff's social security disability form. (R. at 885.) Plaintiff told Nurse Allgood that he "feels tired most of day, all he does is want to sleep. Any walking causes [shortness of breath], dizziness, fatigue. Also having pain in feet." (R. at 885.) Plaintiff endorsed having the following: diaphoresis and malaise/fatigue, palpitations, diarrhea, nausea and vomiting, frequent urination, muscle weakness and leg cramping, dizziness, neuropathy in feet, headaches, polydipsia, depression, and sensitivity

20

to cold and heat, with hot flashes. (R. at 887.) In January 2021, Plaintiff had similar complaints, and noted that his medication was not helping his depression or anxiety. (R. at 878.) Nurse Allgood increased Plaintiff's medication dosage and advised him to track his blood glucose levels more carefully. (R. at 882.)

On June 4, 2021, Plaintiff returned to Nurse Allgood with improved A1C levels. (R. at 954.) She noted that Plaintiff had had a "stressful couple of months. Mother and sister died recently." (R. at 956.) Plaintiff reported that his depression and anxiety medications were not working, despite Nurse Allgood's increased dosage in January 2021. (R. at 956.) Nurse Allgood questioned whether Plaintiff was fully compliant in taking his medicine, as she gave him a sixty-day supply in January 2021, and he had "not called for any refills." (R. at 956.) He reported "trouble keeping a full-time job with time missed and due to fatigue, shortness of breath, decreased endurance." (R. at 956.)

### 6. *Nurse Allgood's Medical Opinion dated December 14, 2020.*

On December 14, 2020, Nurse Allgood completed a diabetes medical source statement in which she indicated that she treated Plaintiff three to four times per year since August 2018. (R. at 825.) In her statement, Nurse Allgood endorsed the following symptoms associated with Plaintiff's diabetes: fatigue, difficulty walking, episodic vision blurriness, excessive thirst, rapid heartbeat/chest pain, sensitivity to light, general malaise, muscle weakness, hot flashes, psychological problem, leg cramping, nausea/vomiting, extremity pain and numbness, diarrhea, frequent urination, sweating, difficulty thinking/concentrating, dizziness/loss of balance, and headaches. (R. at 825.) Nurse Allgood also noted her clinical findings and descriptions of side effects that Plaintiff may experience from his medications. (R. at 825.)

Nurse Allgood then proceeded to rate Plaintiff's ability to perform work-related activities. (R. at 826.) She noted that Plaintiff could walk half of a block without rest or severe pain, and he could sit for forty-five minutes at a time. (R. at 826.) In an eight-hour day, Nurse Allgood estimated that Plaintiff could stand for ten minutes at a time, stand or walk for less than two hours, and sit for about four hours. (R. at 826.) She endorsed his need to walk around during an eight-hour day at ten-minute intervals, for a total of sixty minutes per day. (R. at 826.) Plaintiff also needed unscheduled, ten-minute breaks every twenty minutes, and he needed to elevate his legs at or above the level of his heart for fifty percent of the workday. (R. at 826.) Nurse Allgood limited Plaintiff to rarely lifting and carrying ten pounds or less, and never twenty or fifty pounds. (R. at 827.) She also restricted him to never climbing ladders, rarely twisting, stooping, and climbing stairs, and occasionally crouching/squatting. (R. at 827.) Nurse Allgood then assessed Plaintiff with environmental restrictions, such as avoiding concentrated exposure and permitting moderate exposure to certain temperatures and fumes. (R. at 827.) Finally, she estimated that Plaintiff would likely be off-task twenty-five percent or more of the typical workday, and that he was capable of low-stress work due to his depression, anxiety, and stress. (R. at 828.) Plaintiff would have both "good days" and "bad days," and would be absent more than four days per month. (R. at 828.)

In addition to submitting this statement, Nurse Allgood discussed Plaintiff's subjective complaints and her objective findings in a progress note dated June 4, 2021. (R. at 955-56.) In the note, Nurse Allgood summarized Plaintiff's medication regimen, blood glucose readings, and cardiology findings. (R. at 955-56.) She remarked that Plaintiff felt tired most of the day, needed to stop and take a break, wanted to sleep all the time, and felt short of breath, dizzy, and tired after any walking. (R. at 955.) Plaintiff discussed stressors in his life, such as his mother and sister

dying, and shared that he felt his depression and anxiety medications were not helping. (R. at 956.) Plaintiff's physical examination results were unremarkable. (R. at 959.)

       *7.   The ALJ's Assessment of Nurse Allgood's Medical Opinions.*

The ALJ summarized Nurse Allgood's medical source statement and found it "unpersuasive." (R. at 32.) The ALJ explained that, while Nurse Allgood supported her opinion by "referencing [Plaintiff]'s symptoms, such as fatigue, difficulty walking, chest pain, leg cramping, malaise, dizziness, and muscle weakness . . . [,] [h]er assessment of extreme physical limitations is inconsistent with the totality of the evidence." (R. at 32.) The ALJ then specified that Plaintiff's normal physical examination findings, including "a normal range of motion in the joints, normal gait, and intact strength" were not consistent with "a finding that [Plaintiff] can perform less than light level work," (R. at 32.) Further, the ALJ found Nurse Allgood's off-task behavior and absenteeism unsupported by any objective evidence. (R. at 32.)

As for Nurse Allgood's progress note, dated June 4, 2021, the ALJ apparently evaluated it as a medical opinion and found it "not persuasive." (R. at 33.) She explained that Nurse Allgood "did not cite to any objective evidence to support her conclusion, as she appears to largely base her assessment upon [Plaintiff]'s subjective complaints. Her opinion is inconsistent with the totality of the evidence . . . ." (R. at 33.) Additionally, the ALJ noted that she considered both the objective physical examination results and Plaintiff's "self-reported independence with many activities, such as driving a car, completing chores, shopping in stores, and preparing meals." (R. at 33-34.)

It is clear from the plain language in the ALJ's decision that the ALJ: (1) explicitly articulated the supportability and consistency of Nurse Allgood's opinion in accordance with the regulations; and (2) built a logical bridge from the evidence to her conclusion. Indeed, the ALJ

explained that Nurse Allgood's asserted limitations were not supported by the objective medical evidence, which includes Nurse Allgood's own physical examination findings. (R. at 32-33.) The ALJ noted that these objective findings do not support the extreme physical limitations assessed by Nurse Allgood. (R. at 32.)

Plaintiff argues that the ALJ's "reliance on the absence of objective medical evidence to discredit [Plaintiff]'s subjective complaints regarding symptoms of depression is not allowed" pursuant to the Fourth Circuit's holding in *Shelley C. v. Commissioner*, but the present matter can be distinguished. (Pl.'s Mem. at 12.) First, the ALJ in *Shelley C.* failed to properly evaluate the medical opinion evidence according to the "treating physician rule" that governed SSA medical opinion assessments prior to March 27, 2017. *Shelley C.*, 61 F.4th 341, 354 (4th Cir. 2023). As explained above, the regulations have been modified so that supportability and consistency are the most significant factors when weighing the persuasiveness of a medical opinion. According to the current regulations, an ALJ evaluates a medical opinion's supportability by assessing whether the medical source supported the opinion with "objective medical evidence and supporting explanations," which increases the opinion's persuasiveness. 20 C.F.R. § 404.1520c(c)(1). Thus, a proper analysis of the opinion's supportability requires consideration of at least some objective medical evidence and supporting explanations, and "providers can generally be expected to note abnormalities in their treatment records." *Joan S. v. Kijakazi*, No. 2:21-cv-517, 2022 U.S. Dist. LEXIS 240394, at *20 (E.D. Va. Nov. 18, 2022). Indeed, this Court has previously sustained an ALJ's assessments of medical opinions which failed to articulate specific findings to support stricter restrictions in favor of other objective medical evidence. *See Hyacinth L. v. Comm'r of Soc. Sec.*, No. 2:20-cv-641, 2022 U.S. Dist. LEXIS 175537, at *15 (E.D. Va. Sept. 27, 2022).

Thus, it was proper for the ALJ to consider the extent to which Nurse Allgood supported her assessed limitations with objective evidence.

Moreover, as Defendant points out, the ALJ in this case did not merely discount Plaintiff's subjective allegations "based solely on a lack of consistency with objective medical evidence." (Def.'s Mem. at 16.) As discussed previously, the ALJ described Plaintiff's daily activities, including the extent to which he could perform them, such as needing to have reminders to take his medication every day, struggling with poor focus, having social anxiety, and experiencing difficulty with stress and changes in routine. (R. at 26, 86, 88-90, 287, 291, 362.) Thus, the ALJ's decision demonstrates that she thoroughly reviewed the record in its entirety when she assessed Nurse Allgood's opinions. A review of the ALJ's decision indicates that she built a logical bridge from the evidence to her conclusion, as the record demonstrates instances in which Plaintiff reported and demonstrated greater abilities than Nurse Allgood opined.

Upon review of the record and the ALJ's decision, the undersigned finds that: (1) the ALJ sufficiently articulated her reasoning for finding the medical opinions of Dr. Wood and Nurse Allgood not persuasive; and (2) substantial evidence supports the ALJ's findings.

## C.    The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity.

Plaintiff next argues that the ALJ's residual functional capacity is not supported by substantial evidence because the ALJ failed "to make a specific finding on whether [Plaintiff]'s intermittent incapacity constitutes an inability to engage in substantial gainful activity." (Pl.'s Mem. at 13.) Specifically, Plaintiff argues that the following symptoms cause "intermittent capacity" and preclude him from full-time employment: "fatigue requiring sleep (naps), shortness of breath, needing frequent breaks, periods of isolation, paranoia that people are watching him, difficulty focusing, heavy sweating, nausea, episodic vision blurriness, leg cramping, and

drowsiness." (Pl.'s Mem. at 14.) Consequently, according to Plaintiff, the ALJ's residual functional capacity "failed to properly account for [Plaintiff]'s concentration, persistence, and pace limitations" because it did not include any limitations to "non-production work, or even simple, routine, and repetitive work." (Pl.'s Mem. at 14.) "Nor did [the ALJ] make a finding or discuss [Plaintiff]'s ability (or inability) to perform work with any regularity or consistency weekly or monthly in a competitive employment environment." (Pl.'s Mem. at 14.) Such an "omission is significant because the vocational expert testified that an individual could not maintain competitive employment if he missed up to three days of work per month or would be off-task 15% of the working day for health reasons." (Pl.'s Mem. at 14.)

Defendant responds that the ALJ specifically stated that she "considered Plaintiff's impairments individually and in combination" and "considered the whole record" before finding Plaintiff not disabled. (Def's Mem. at 18.) Defendant contends that Plaintiff "essentially asks this Court to re-weigh the evidence, which is not it's [sic] role." (Def.'s Mem. at 18 (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).)

Indeed, the Court's role is to determine whether substantial evidence exists in the record to support the ALJ's final decision, and whether the ALJ employed the correct legal standard in reaching that decision. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Merely disputing conclusions reached or highlighting favorable evidence does not establish that the ALJ's decision was not supported by substantial evidence, or that the ALJ applied an incorrect legal standard. *See Hays*, 907 F.2d at 1456. It is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the ALJ if her decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962)).

26

Ultimately, it is the duty of the ALJ reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456 (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) ("This Court does not find facts or try the case *de novo* when reviewing disability determinations.")); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972) ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").

As discussed above, the ALJ's narrative decision directly cites Plaintiff's subjective statements regarding the symptoms caused by his impairments. For instance, with regard to concentration, persistence, or maintaining pace, the ALJ acknowledged Plaintiff's testimony that "he struggle[d] with poor focus daily." (R. at 26.) However, Plaintiff "stated that he always finishes tasks after starting" and "can complete chores, prepare meals, drive a car, and handle his own finances, demonstrating an ability to maintain a basic level of focus for daily tasks." (R. at 26.) Further, the ALJ cited to medical records in which Plaintiff "exhibited a normal attention span and concentration on examination" as well as "normal psychomotor activity." (R. at 26.) The ALJ considered the state agency psychological consultant's opinion that Plaintiff's mental impairments were non-severe, finding it persuasive because he referenced Plaintiff's "conservative management of mental health symptoms with medication, as well as his independence with daily activities, including driving a car, shopping in stores, completing chores, and managing his own finances." (R. at 31.) Consequently, the undersigned finds that the ALJ properly assessed

Plaintiff's ability to concentrate, persist, or maintain pace, in finding that he had no limitations, and the ALJ reasonably declined to limit Plaintiff to "non-production work or simple, routine, and repetitive work." (Pl.'s Mem. at 14.)

As for Plaintiff's physical impairments, the ALJ found that Plaintiff's "testimony that he is unable to sustain work activity is inconsistent with his self-reported daily activities, and medical history, which support greater functional abilities." (R. at 30.) She explained that his medical records show that his "physical functioning has steadily improved since his myocardial infarction." (R. at 31.) At one point, Plaintiff could return to work part-time, and was having less shortness of breath, which allowed him to cut his grass without stopping to rest. (R. at 31.) Though his progress in that regard worsened, his cardiologist found that "given [Plaintiff]'s ejection fraction of 40 percent, he should be able to do most activities." (R. at 31.) The ALJ noted that Plaintiff's activities included being able to "manage his own personal care, use a smartphone to check emails and surf the internet, prepare meals, complete chores, drive a car, and manage finances." (R. at 30-31.) Plaintiff also cared for his three children and "often prepared their meals." (R. at 31.)

Further, the ALJ considered the state agency medical consultant's opinion that Plaintiff could "sustain light level work." (R. at 32.) She found this opinion persuasive because it accounted for Plaintiff's daily activities, "such as light cooking, completing household chores, driving a car, shopping in stores, and assisting his three children with virtual schooling and schoolwork." (R. at 32.) The opinion was also "consistent with generally normal physical examinations, showing a normal range of motion in the joints, normal gait, and intact strength." (R. at 32) (citations omitted.) Moreover, the ALJ directly addressed the symptoms that Plaintiff alleges "cause intermittent incapacity" by stating: "[i]n consideration of the symptoms of [Plaintiff]'s physical impairments, including shortness of breath, dyspnea, chest pain, morbid obesity, and generalized

28

fatigue, [Plaintiff] requires postural limitations." (R. at 34.) The ALJ also assessed further environmental restrictions "[d]ue to the possibility of worsening symptoms in extreme environmental conditions . . . ." (R. at 34.)

Plaintiff contends, however, that the ALJ erred in finding him capable of work at the light exertional level" because "[t]he record is replete with evidence that [Plaintiff] cannot stand and walk for six out of eight hours due to shortness of breath, fatigue, sores on his feet, swelling, pain, and numbness." (Pl.'s Mem. at 15.) Plaintiff points to evidence that he "tried returning to work after his heart attack but reported feeling light-headed and short of breath when walking." (Pl.'s Mem. at 15, citing R. at 725.) However, Plaintiff's argument amounts to no more than an invitation for this Court to substitute its judgment for that of the ALJ, which the undersigned cannot do. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Instead, the Court must examine the record to determine if the ALJ followed the applicable law and supported her findings with substantial evidence. A review of the record shows that the ALJ addressed relevant evidence and accounted for Plaintiff's medically determinable impairments in accordance with the regulations. As a result, the undersigned finds the ALJ did not err in her residual functional capacity determination, and substantial evidence supports her findings.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary (ECF No. 18) and Motion for Remand (ECF No. 19) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED, and the final decision of the Commissioner be AFFIRMED.  Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Henry E. Hudson. and to all counsel of record.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

Richmond, Virginia
Date: August 1, 2023

_____/s/_ MRC
Mark R. Colombell
United States Magistrate Judge